### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

Metropolitan Enterprise Corp.,     :
    Plaintiff,                     :
                                 :
v.                                 :     Civil No. 3:03cv1685(JBA)
                                 :
United Technologies International   :
Corp., et al.,                     :
    Defendants.                   :

### RULING ON DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT [DOC. # 83]

    This commercial dispute arises out of a contract between Metropolitan Enterprise Corporation ("Metropolitan"), a Taiwanese company with its principal place of business in Taipei, and defendants United Technologies International ("UTI") and its predecessor, United Technologies International Operations, both incorporated under the laws of the State of Delaware with principal places of business in East Hartford, Connecticut. <u>See</u> Third Am. Compl. [Doc. # 76], ¶¶ 1-3. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. Plaintiff claims UTI breached the covenant of good faith and fair dealing (Count One), violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a <u>et seq.</u> (Count Two), and breached a fiduciary duty owed to plaintiff (Count Three). Defendants have moved for summary judgment on all claims. <u>See</u> Def. Mot. for Summary Judgment [Doc. # 83]. For the reasons that follow, defendants' motion will be granted as to Count Three and denied as to the remaining counts.

1

I.    **FACTUAL BACKGROUND**

Defendant UTI is a wholly owned subsidiary of United Technologies Corporation ("UTC"), and is responsible for international marketing of UTC products.  Among the various divisions of UTC is jet engine manufacturer Pratt & Whitney ("P&W").  On May 16, 2001, UTI and Metropolitan entered a three-year "Sales Representation Agreement" whereby UTI appointed Metropolitan to "represent UTI in promoting sales of products and/or services of Pratt & Whitney Large Commercial Engines" within Taiwan.  See Mem. of Law in Support of Def. Mot. for Summary Judgment [Doc. # 85], Ex. A.  UTI selected Metropolitan because that firm had been representing another UTC business, Sikorsky Aircraft, in its sales of helicopters in Taiwan, and P&W felt it needed advice on "local business and customs."  Liu Decl. at ¶ 4; Scamuzzi Depo. at 15.  As one P&W employee testified, UTI wanted Metropolitan's president, David Liu, "to open doors." Scamizzu Depo. at 15.

Under the contract, UTI agreed to provide "reasonable quantities of literature, technical data and specifications" as well as personnel to assist Metropolitan in its promotional campaign.  Def. Mem. of Law, Ex. A, Art. I.  In turn, Metropolitan was obligated to "use its best efforts to obtain responsible purchasers for the Products" in Taiwain, including establishing contact with potential purchasers, keeping UTI and

2

P&W advised of potential markets, submitting regular reports, "developing and implementing marketing and action plans for sales programs," and helping P&W representatives during visits to Taiwan. Id. The agreement states that Metropolitan "agrees to act only as an independent contractor with the understanding that the Representative is not authorized to make any commitments for, or to act as an agent on behalf of, UTI for any purpose whatsoever." Id.

Metropolitan was to receive a retainer of $12,500 per month as a "non-refundable advance against commissions and minimum compensation in the event total commissions are less than the total retainer." Id., Sched. to Ex. 1. If Metropolitan succeeded in selling P&W products to, among others, China Airlines, Metropolitan would earn a commission of 1.8% of the gross sales price. The agreement stated that "the current China Airlines (CAL) campaign" was expected to yield an order for 14 to 18 new "PW4000-class" aircraft engines from P&W in December 2001, and if the deal went through, Metropolitan's commission would be paid in advance. Id. Other commissions were to be paid upon receipt of the purchase price by UTI.

P&W had had a business relationship with CAL for 40 years, supplying CAL with engines, parts, and maintenance services. In approximately 1999, however, their relationship became strained due to a "'surge' phenomenon occurring in engines for Boeing 747

3

aircraft that CAL had previously purchased from P&W."  Liu Decl.
at ¶ 5.  After research, P&W determined that fitting each engine
with a "ring case" would reduce the likelihood of engine surge,
and estimated the total cost of these repairs at $19.6 million.
Keady Aff. at ¶ 13.  CAL, however, believed that the surge
phenomenon was a design defect that P&W should repair for free.
This dispute was perceived as an obstacle to further transactions
between the parties.  When he was hired by UTI, Metropolitan's
President Liu understood that his task "was to assist P&W in
mending its relationship with CAL so that P&W could participate
in bidding for the sale of large commercial jet engines to CAL in
the ensuing engine campaign... ."  Liu Decl. at ¶ 5.

        The surge phenomenon dispute was only partially resolved.
After negotiations led by Metropolitan, CAL agreed to accept $8
million from P&W in settlement of its damages claims.  Id. at ¶
12.  However, the "ring case issue," as a potential long term
solution to the problem, was not resolved at the time.  Id. at ¶
13.  Instead, Metropolitan "convinced CAL to consider P&W's
proposal to sell commercial jet engines to CAL in the ensuing
engine campaign if P&W would include an acceptable resolution of
the 'ring case issue' in its engine proposal, so that the
acceptance by CAL of said proposal would automatically result in
the resolution of the 'ring case issue.'"  Id.

        In January 2003, CAL invited a bid from P&W, along with

4

other competitors including General Electric and Rolls Royce, for jet engines to equip a number of new Boeing 747 and Airbus 330 aircraft.  Id.[1]  The invitation apparently included a request by CAL that P&W submit a proposed side agreement concerning the ring cases.  Id.  P&W submitted technical specifications on April 18, 2003, which were approved by CAL.  Pl. Ex. 10.  Then on May 26, 2003 P&W submitted a commercial bid, called a "Term Sheet," which was set to expire on June 6.  Def. Mem. of Law, Ex. C.  The bid was subject to further negotiations, as it stated that "neither party is obligated to proceed until a Definitive Agreement is executed by both parties."  Id.  On June 5 CAL obtained agreement from P&W to extend the offer until June 20.  Keady Aff. at ¶ 9. As the parties expected, CAL also pushed for further large price concessions.  Scamuzzi Depo. at 114-15; Email from Liu to Scamuzzi, 6/10/03, Pl. Ex. 16.

In response to CAL's request, William Scamuzzi, P&W's General Manager for Taiwan, wrote on June 10, "I intend to send a note telling CAL we are done - the additional demands represent between approximately 1/4 of a Billion U.S. Dollars in concessions and risk. ... Sorry guys - it's over ... ."  Email from Scamuzzi to Liu et al., Pl. Ex. 16.

P&W did not, however, withdraw the bid at that time.  CAL requested that the Term Sheet be extended again until June 30,

_____

[1]While Liu's declaration references the Request for Proposal as "Ex. 53," this document has not been included in the Summary Judgment record.

2003.  P&W extended the date, but altered several terms of the bid, including reducing the offered Introductory Assistance Credit for purchase of the A330 engines from 65% to 54%, resulting in an effective price increase of $37 million.  Letter from Scamuzzi to Brian Chou, 6/20/03, Pl. Ex. 25.

Earlier in June, P&W already had decided that it would not be economical for it to fulfill the terms it had offered in its bid.  On June 2, 2003, Scamuzzi had written to Susan Walsh of P&W's corporate office: "we can no longer afford to win the CAL campaign - it would represent approximately $40M+ in negative margin per year in 2004, 2005, 2006.  We could possibly afford the 6 747s but certainly not the 12 to 18 A330s.  To date the RFP from CAL has been for both fleets but in this third and final RFP, they have asked us if we can split the deal.  However, we are No.1 currently both technically and financially and CAL says they can and may still buy both fleets from the winner and that they [sic] request to split the offer does not mean they will."  Pl. Ex. 55.

Scamuzzi testified that "Pratt & Whitney's objective was not to win the 12 firm - or the desire was not to win the 12 firm A330 engines at the concession level in effect."  Scamuzzi Depo. at 117.  In a June 9 email to Keady, P&W's Vice President for Sales, Large Commercial Engines, Asia Pacific Region, regarding CAL's demand for further concessions, Scamuzzi stated P&W's

6

position as, "we do not want to 'encourage' winning the A330s but would like to win the 747s... ."  Pl. Ex. 56.  In response, Keady stated, "I thought I was completely unambiguous.  We are not going to win this campaign."  Id.  Keady's email continued: "Further, no one is traveling to Taipei. ... You've done a great job here, but we have clear instructions that we must follow." Id.  Plaintiff interprets the last sentence as indicating Keady's instructions were that P&W should lose the bid entirely. Scamuzzi's deposition testimony was that his instructions were only "not to promote the higher discount for the 12 firm A330s," Scamuzzi Depo. at 113, though this appears to contradict a June 11, 2003 email he wrote to Keady stating that "[a]lthough CAL's recent demands [for price concessions] appear to give us every assurance of losing by being non responsive to their latest requests, such action still may not be a 100% guarantee that we will lose."  Pl. Ex. 57.  Scamuzzi's email gave several non-financial reasons why he believed P&W still would be the favored contender for the engine contracts, including incumbency and the political relationship between P&W and the Taiwanese government. Id.  He concluded, "In summary, although I am taking no further action to address CAL's continuing requests for additional discounts, guarantee rate reductions or improvements in the RC [ring case] settlement issue, there is no 100% guarantee we will lose unless we withdraw."  Id.

Further, on June 17, 2003, Scamuzzi again wrote to Keady:

> Feedback through various channels at CAL indicate[s] that we are winning everything so I am alerting you that <u>we need a more effective communication plan to stop it.</u> This morning I received a request from CAL to extend the proposal to the end of June ... I know the answer and passed on to David [Liu] what our response would be - <u>unfortunately this also may not be enough to lose</u> ... Revisiting our negative margin for one last time, there are some areas in which we could attempt last minute demands that would reduce the number and further <u>turn off CAL</u>, thereby forcing the decision to go with a competitor... .

Pl. Ex. 48 (emphases supplied).

Apparently P&W still had not succeeded in discouraging CAL. Metropolitan's President Liu received information from Peter Huang of CAL that CAL preferred P&W engines from a technical standpoint over those manufactured by competitors General Electric and Rolls Royce. Liu Depo. at 36. One Mr. Chang from Taiwan's Ministry of Commerce also reported to Liu that the Taiwanese government had decided to support P&W's bid. <u>Id.</u> at 36-37. On June 19, Liu sent an email to P&W saying that he had received:

> ... confidential information that CAL President Wei briefed to our Minister Lin of MOC [Ministry of Commerce] about the result of evaluation on the three [bids] in this afternoon. P&W is slightly ahead of the other two. CAL relies on the good services that P&W has provided in the past and regards P&W to be the best on[e] to help CAL develop third party business in China, in addition, F-16 engine maintenance is a big business that CAL focuses on and that will depend on cooperation with P&W. President Wei reported the above to Minister Lin and got his support that P&W is the right choice. ...

> This afternoon I got phone call from my friend in the
> MOC to congratulate on the coming success of P&W.  At
> the moment, I cannot tell I'm happy or puzzled because
> I do not know how P&W will react once CAL awards the
> contract to P&W. ... If P&W finally chooses to give up
> I cannot imagine how stunned CAL will be, especially
> when they've got Minister Lin's support on their
> choice.  P&W will be extremely embarrassed as well. ...

Pl. Ex. 22.  The $37 million price increase was imposed the next day, June 20, 2003.  Although negotiations continued through August 2003, CAL did not accept P&W's bid and instead awarded the entire contract to General Electric.  Keady Aff. ¶ 12.[2]

On August 26, 2003, President Wei of CAL wrote to Louis R. Chenevert, President of P&W, expressing disappointment that the deal did not come through "due to certain acts of P&W described below."  Pl. Ex. 52.

> As you may already know, P&W was favored at the
> commencement of the bidding process for the engine
> selection.  In all probability, a contract would have
> been awarded to P&W but for its sudden reduction of the
> A330 engine discount by 11%, which caused an increase
> of $37.5M to the purchase price.  Despite my
> disappointment over the sudden price increase, I called
> your Representative David Liu on August 8 to inform him
> that a contract for both the 747s and the A330s would
> still be awarded to P&W if the price is cut by $24M
> (from $37.5M).  To my further disappointment, P&W
> responded negatively. ...

Id.  Wei continued that he still was "interested in negotiating a settlement with P&W with regard to its ring case cost offset." Id.

---

[2]Although CAL issued a notice of award to GE, apparently there was no formal, final contract between GE and CAL by 2004, when discovery was concluded in this case.  Liu Depo. at 233.

Charles Peng of CAL testified that David Liu in fact had instructed CAL what Wei should say in the above paragraph concerning the loss of the bid, but that the paragraph did not accurately reflect CAL's position.  Peng Depo. at 70.  He stated that price was not the deciding factor in CAL's decision, but rather CAL factored in the engine's safety record, the market share of the manufacturer, the costs of maintenance and fuel, the simplicity of the engines, and the warranty, as well as the purchase price.  Id. at 29.  Peng also testified that CAL would have "prefer[red] to get these ring cases for free," though the ring case issue was not an absolute barrier to awarding the contract to P&W.  Id. at 83.

Nonetheless, plaintiff contends that P&W would have received the contract, and Metropolitan consequently would have received its commission, but for P&W's last-minute price increase. Metropolitan further contends that P&W never had any intention of carrying out an engine contract with CAL, but hired Metropolitan "to reach their true goal of a joint venture with CAL regarding [] maintenance and repair facilities," which would not have resulted in any commission to Metropolitan under the Sales Representation Agreement.  Liu Decl. ¶ 13.  Liu also asserts that he "had learned, through the jet engine business community, that prior to the date Defendants altered their bid to CAL at the eleventh hour, Defendants had decided as a business matter to

10

limit or curtail their commercial jet engine sales.... Plaintiff learned in mid-June [2003]... that Defendants had lost a jet engine deal with Egypt Airlines under similar circumstances...." Id. at ¶¶ 28-29.

Unaware that P&W would change its mind about pursuing all or part of the CAL engine contract, Metropolitan engaged in substantial efforts to resolve the "surge" issue and burnish P&W's image with CAL and the Taiwanese government, which owns a large share of CAL.  Although Liu estimates that he incurred $1.2 million in out-of-pocket expenses representing P&W, Liu Decl. at ¶ 10, he does not seek these reliance damages, but instead seeks the $14.3 million he would have received under the May 26, 2003 Term Sheet.  Pl. Interrogatory Responses, Def. Ex. J, at 5.

## II.   STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriquez v. City of N.Y., 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).

"The duty of the court is to determine whether there are issues
to be tried; in making that determination, the court is to draw
all factual inferences in favor of the party against whom summary
judgment is sought, viewing the factual assertions in materials
such as affidavits, exhibits, and depositions in the light most
favorable to the party opposing the motion." Id. (citations
omitted).  "If reasonable minds could differ as to the import of
the evidence ... and if there is any evidence in the record from
any source from which a reasonable inference in the nonmoving
party's favor may be drawn, the moving party simply cannot obtain
[] summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54,
59 (2d Cir. 1997) (internal citations, alterations and quotations
omitted).

## III. DISCUSSION

Defendants move for summary judgment on two grounds.  First,
they argue that Metropolitan cannot establish liability on any of
the claims in the complaint because it cannot prove that P&W's
conduct proximately caused the loss of Metropolitan's commission,
or the amount of the commission, given that CAL did not indicate
willingness to accept the terms of the May 26, 2003 offer, and
given Peng's testimony concerning the factors that entered CAL's
decisionmaking process in awarding the contract.  Second,
defendants argue they are entitled to summary judgment on the
breach of fiduciary duty claim because there was no agency

relationship between Metropolitan and UTI, and even if there were
such a relationship, UTI as principal could not legally be held
to owe a fiduciary duty to Metropolitan, the agent.

### A.   Proximate Cause

Metropolitan's President David Liu testified that he was
informed by Taiwanese Vice Minister Chang in June 2003, and by
CAL President Wei in August 2003, that CAL would have awarded the
engine contract to P&W but for P&W's last-minute price increase.
Liu Depo. at 36-37.  In support of this assertion, Metropolitan
has proffered an August 26, 2003 letter from Wei to P&W's
President Chenevert stating, "In all probability, a contract
would have been awarded to P&W but for its sudden reduction of
the A330 engine discount by 11%, which caused an increase of
$37.5M to the purchase price."  Pl. Ex. 52.

### 1.   Wei's Letter

Defendants contest Wei's letter as inadmissible hearsay.
Although the Supreme Court has held that the nonmoving party need
not "produce evidence in a form that would be admissible at trial
in order to avoid summary judgment," Celotex, 477 U.S. at 324, a
party must show that the evidence could be rendered in an
admissible form at trial.  Catrett v. Johns-Manville Sales Corp.,
826 F.2d 33, 37 (D.C. Cir. 1987).  For example, the plaintiff in
Catrett (after remand by the Supreme Court in Celotex) proffered
a letter from defendant's employee stating that her deceased

husband had worked with defendant's asbestos product, and
plaintiff also stated in her answer to interrogatories that she
intended to call the author of the letter as a witness at trial.
The Court of Appeals held, "[t]aking this [interrogatory]
response together with the ... letter, the record,
dispassionately viewed, reflects the existence of a witness who
can testify with respect to [the decedent's] exposure to"
defendant's asbestos.  <u>Id.</u> at 38.  The letter, along with other
evidence, was found to create a genuine issue of material fact
preluding summary judgment.  <u>Id.</u> at 39.

> Courts have routinely considered documents in deciding
> summary judgment motions.  Yet, at the time of their
> attempted submission for summary judgment purposes, the
> form of these documents is hearsay in nature; a letter,
> for example, will not be sworn to by the signatory.
> Nonetheless, courts ... do admit and rely upon letters
> and other documents that constitute evidence potentially
> admissible at trial....  <u>As long as it is clear at the
> time of the summary judgment motion that the evidence
> could be subsequently put into admissible form at trial</u>,
> there would seem to be little to be gained by requiring
> the nonmovant to take the time and effort to restructure
> the evidence [into admissible form] at the summary
> judgment stage.

Edward Brunet, <u>Summary Judgment Materials</u>, 147 F.R.D. 647, 656-67
(1993) (emphasis supplied).[3]

In this case, however, the parties agree that Wei is

---

[3]<u>Cf.</u> Charles Alan Wright, et al., 10A <u>Fed. Practice & Procedure</u> 3d §
2722 (2005) ("To be admissible, documents must be authenticated by and
attached to an affidavit that meets the requirements of Rule 56(e) and the
affiant must be a person through whom the exhibits could be admitted into
evidence.  Thus, a letter submitted for consideration under Rule 56(e) must be
attached to an affidavit and authenticated by its author in the affidavit or a
deposition.").

unavailable to testify because he resides and works in Taiwan and will not voluntarily appear at the trial.  His letter therefore remains inadmissible hearsay unless plaintiff can show that it meets an exception to the hearsay rule.

Metropolitan argues that the letter is admissible as a statement against CAL's interest because Wei's comments "expose CAL to tort liability for unfair bidding practices" and "also put in jeopardy CAL's continuing and future business/pecuniary relationships with GE and RR by disclosing that: (1) CAL had decided to award the contracts to UTI prior to the date on which a decision was supposed to have been made; (2) CAL delayed making its engine selection decision for almost two months due to UTI's last minute price increase... and (3) while CAL was continuing to make demands upon GE ... it was simultaneously continuing to seek a way to award the contracts to UTI...."  Mem. of Law in Opp. to Def. Mot for Summary Judgment at 16-17.  Wei's letter states only that "P&W was favored at the commencement of the bidding process...."  Pl. Ex. 52.  It does not state that CAL had decided to award the contract to P&W before the deadline.  Nor is the fact that CAL simultaneously negotiated with P&W and GE indicative of bad faith or unfair bidding practices, because the contract had not yet been awarded (and never was awarded) to P&W. Metropolitan cites no authority indicating that CAL's actions

15

would subject CAL to tort liability under Connecticut law.[4]
Therefore Wei's statements do not appear to meet the hearsay
exception for statements against interest and will not be
considered in opposition to UTI's summary judgment motion.

## 2. Remaining Evidence

Liu testified that based on information he obtained from his
contacts at CAL and the Taiwanese government, P&W was the
frontrunner for the contract and would have won if it had not
reduced its price concessions by $37 million at the last moment.
Liu Depo. at 36-37.[5]  Liu's inside information was credited by

---

[4]The cases cited by plaintiff, see Mem. of Law in Opposition [Doc. # 100] at 16, do not show that merely holding a preference for one contractor at the outset of bidding, or engaging in preliminary negotiations with several parties before awarding a contract, is an unfair business practice under Connecticut law.  Johnson Elec. Co. v. Salce Contracting Assocs., 72 Conn. App. 342, 344, 346, 805 A.2d 735, 737, 738 (2002), held a defendant liable for CUTPA violations where he denied a contract to a subcontractor who had been named in the successful final bid proposal of the general contractor. Similarly, Bridgeport Restoration Co. v. A. Petrucci Constr. Co., 211 Conn. 230,  557 A.2d 1263 (1989) (per curiam), held that the defendant contractor violated CUTPA when he made a conditional contract with a subcontractor to award work to the subcontractor if he won the general contract, but then failed to award the subcontract as promised.  The court in Quality Elec. Co. v. Suffolk Constr. Co., No. CV92 0518000S, 1993 WL 256385 (Conn. Super. Ct., June 30, 1993), denied a motion to strike on the basis that: "The allegations that plaintiff was induced by defendant's words and actions to derive and deliver a quote for electrical work, hire one engineer, prepare and deliver highly particularized breakdowns of additional costs for additional work, and perform certain electrical work for defendant, combined with the allegation that defendant refused to award plaintiff the contract, could be construed as acts in violation of the second and third elements of the 'cigarette rule' factors."
In contrast, there is no claim here that CAL ever named P&W the winner of the engine contract, promised to do so, or induced either P&W or Metropolitan to expend time or effort performing any aspect of the contract that CAL later declined to award to P&W.  Simply favoring one bidder at the outset of the bidding process, without more, is not actionable under CUTPA.

[5]Although defendants also challenge the admissibility of Liu's oral and written statements as hearsay, the statements may be admissible for the nonhearsay purpose of showing their effect on the listeners, i.e., P&W personnel involved in the contract negotiations.

P&W in June 2003, when Scamuzzi wrote, "[f]eedback through various channels at CAL indicate[s] that we are winning everything so I am alerting you that we need a more effective communication plan to stop it."  Pl. Ex. 48.[6]  It can be inferred from the fact that P&W imposed the $37.5 million price increase the next day that P&W believed that the increase would cause them to lose the contract.  Further, that CAL then attempted to negotiate for a concession of $24 million, but no other changes in terms, supports an inference that price was CAL's primary consideration.

This is disputed by CAL's Charles Peng, who testified that CAL considered many factors other than price, and that CAL's concern over the "engine surge" problem was "the main reason" that CAL was "worried" about awarding a contract to P&W.  Peng Depo. at 29, 84.  Peng's testimony is in turn disputed by Liu, who testified that he was aware of CAL's concern about the "engine surge" problem but that it would not prevent closing the deal, Liu Depo. at 91-92, and by P&W's Term Sheet, which included a proposed side agreement that would have resolved the surge problem if CAL chose P&W's new engines.

---

[6]Although UTI challenges these emails as irrelevant and therefore inadmissible "impressions or opinions about the basis for the CAL decision," Reply Br. [Doc. # 95] at 5, the beliefs of UTI's employees concerning whether a price increase would sink P&W's bid for the engine contract are relevant to the issue of defendant's motivation in this case.  Scamuzzi's e-mails tend to show that P&W personnel believed Liu's statements that P&W was the frontrunner for the contract, and thus may support plaintiff's ultimate argument that the price increase was designed to, and did, cause P&W to lose the contract and Metropolitan to thereby lose its commission.

The temporal proximity of the events in this case could lead a reasonable jury to infer causation.  The $37.5 million price increase was imposed one day after Liu told P&W that he believed P&W was positioned to win both contracts.  Although CAL waited two months after that to award the contract to GE, and although Keady stated that UTI did make further revisions to its offer between June and August 2003, Keady Aff. ¶ 11, Liu stated that it was P&W which rejected CAL's "final counterproposal" for a $24 million reduction on August 8, 2003, Liu Decl. ¶ 20, creating a reasonable inference that P&W never intended to negotiate concessions because it did not want to win the contracts.

Although considerably weaker without Wei's corroborating letter, Metropolitan's evidence shows the existence of a genuine dispute of fact concerning whether P&W intended its $37.5 million price increase on June 20, 2003 to doom its bid, and whether it was successful in so doing, or whether the "engine surge" problem or some other non-price factor caused CAL to turn down P&W's bid.

There is also dispute over whether P&W was deliberately trying to lose just part of the CAL contract or the entire contract.  Scamuzzi Depo. at 117; Pl. Exs. 48, 56, 57.  Scamuzzi stated that the A330 contract would be unprofitable but P&W still was pursuing the 747 contract, while Liu stated that word had circulated "through the jet engine business community" that P&W was getting out of the jet engine market altogether.  Liu Decl. ¶

28.  Keady's email stated flatly, "We are not going to win this campaign," Pl. Ex. 56, and Scamuzzi was apparently searching for "a 100% guarantee that we will lose," Pl. Ex. 57.  This dispute of fact concerning whether P&W intended to lose only the A330 bid or the 747 bid as well implicates not only UTI's liability but also whether Metropolitan's damages, if any, include that portion of the contract attributable to the 747 engines as well as the A330 engines.

Defendants argue that Metropolitan is entitled to no damages because as of June 20, 2003, P&W's Term Sheet had not been internally reviewed and approved as required by CAL policy.  Defendants' argument cycles back to the disputed issue of whether P&W's price increase, or some other factor or factors, motivated CAL to turn down P&W's proposal.  As Liu testified, before a Term Sheet may be accepted, CAL requires approval from its technical committee, its financial committee, its President, the CAL board of directors, and its holding company, which includes representatives of the Taiwanese government.  Liu Depo. at 30-31, 203-05.  It is undisputed that P&W's Term Sheet had been approved by the technical committee and President Wei, but not by the remaining required parties.  Id. at 36, 39-40.  Although CAL had not fully approved any of the bids by their expiration dates because CAL was still attempting to negotiate with P&W, a jury reasonably could find that, had P&W not raised the A330 engine

19

price by $37.5 million at the last moment, CAL would have completed internal approval process and approved one of P&W's two Term Sheets.

Finally, although defendants argue that plaintiff cannot show CAL would have accepted the May 26 Term Sheet in full, as CAL attempted to negotiate further concessions after the initial bid, this argument relates only to the amount of Metropolitan's damages.  If a jury finds that CAL would have awarded P&W the contract but for the last-minute price increase intended to avoid the contract award, it would then be up to the jury to decide whether Metropolitan would have earned a commission based on the May 26 Term Sheet, the June 20 Term Sheet, or on some other terms, or that plaintiff's evidence is inconclusive for this purpose given all the variables.

Thus disputed issues of material fact exist concerning the proximate cause of Metropolitan's loss of commission, and defendants' summary judgment motion on this basis must be denied.

**B.   Breach of Fiduciary Duty**

Defendants also move for summary judgment on Metropolitan's breach of fiduciary duty claim (Count Three), on the basis that no fiduciary relationship between Metropolitan and UTI existed, and even if it did, as a matter of law a principal does not owe a fiduciary duty to an agent.  Assuming, without deciding, that Metropolitan was UTI's agent for purposes of the Sales

Representation Agreement, the Court agrees with defendants'
contention that as a principal, UTI owed plaintiff no fiduciary
duty.

Under Connecticut law, an "agent is a fiduciary with respect
to matters within the scope of his agency" and therefore has a
fiduciary duty of loyalty to the principal.  Taylor v. Hamden
Hall School, 149 Conn. 545, 552, 182 A.2d 615, 618 (2004)(citing
Santangelo v. Middlesex Theatre, Inc., 125 Conn. 572, 578, 7 A.2d
430, 433 (1939)); see generally Cadle Co. v. D'Addario, 268 Conn.
441, 456, 844 A.2d 836, 847 (2004).

Neither the parties nor the Court have discovered any
Connecticut cases discussing a principal's reciprocal duties to
an agent, but Connecticut generally appears to follow the
Restatement approach to questions of agency law, see, e.g.,
Flanagan v. Blumenthal, 265 Conn. 350, 368, 828 A.2d 572, 582
(Conn. 2003), and, as a federal district court sitting in
diversity jurisdiction, this Court predicts that, if presented
with this issue, the Connecticut Supreme Court would follow the
Restatement of Agency concerning the duties owed between
principals and agents.  Under the Restatement, the principal's
duty is "to deal with the agent fairly and in good faith,
including a duty to provide the agent with information about
risks of physical harm or pecuniary loss that the principal
knows, has reason to know, or should know are present in the

21

agent's work but unknown to the agent." Restatement (Third) of Agency, § 8.15.

A duty of good faith, however, is not a fiduciary duty, and the cases cited by plaintiff are not to the contrary. See Lawrence Warehouse Co. v. Twohig, 224 F.2d 493, 497 (8th Cir. 1955) ("A principal has the obligation of exercising good faith toward his agent in the incidents of their relationship. He is subject to the responsibility in favor of the agent of using care to prevent harm coming to the agent in the prosecution of the enterprise, and this extends in general to his disclosing facts which, if unknown, would be likely to subject the agent to pecuniary loss.") (internal citations and quotation marks omitted); McLendon v. Ga. Kaolin Co., 782 F. Supp. 1548, 1563 (M.D. Ga. 1992) ("The relationship between principal and agent is confidential and fiduciary, and under this relationship, an agent owes his principal a full duty of disclosure. A principal, on the other hand, has the obligation to exercise good faith in the relationship and to disclose facts which, if known, would likely cause the agent to suffer pecuniary loss.") (internal citations and quotation marks omitted); Sidella Export-Import Corp. v. Rosen, 273 A.D. 490, 78 N.Y.S.2d 155 (N.Y. App. Div. 1948) ("Every contract of agency carries with it an implied obligation on the part of the principal to do nothing that would thwart the effectiveness of the agency.").

Thus, a principal owes to its agent the duties of good faith and disclosure of known financial risks, which is covered by Metropolitan's allegation of breach of good faith in the performance of the Sales Representation Agreement, set forth in Counts One and Two of its complaint.[7]  However, there is no authority for the proposition that a principal acts as a fiduciary for its own agent.  For this reason, plaintiff's claim for breach of fiduciary duty must fail, and defendants' motion for summary judgment will be granted on this claim.

**IV.   CONCLUSION**

Accordingly, defendants' motion for summary judgment [Doc. # 83] is GRANTED as to Count Three of the Third Amended Complaint and DENIED as to the remaining counts.

                    IT IS SO ORDERED.


                         /s/
                    _____
                    JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, September 20, 2005.**

_____

[7]Therefore the holding on Count Three does not affect Counts One and Two in this case because Plaintiff need not show the existence of an agency relationship to prove its claim for breach of the implied warranty of good faith and fair dealing.  See Buckman v. People Express Inc., 530 A.2d 596, 599 (Conn. 1987) (allegation of bad faith breach of insurance contract states a claim for tort recovery under Connecticut law); accord, Otis Elevator v. Factory Mut. Ins. Co., 353 F. Supp. 2d 274, 284 (D. Conn. 2005); United Techs. Corp. v. Am. Home Assurance Co., 118 F. Supp. 2d 181, 186, 188 (D. Conn. 2000); United Techs. Corp. v. Am. Home Assurance Co., 989 F. Supp. 128, 135 (D. Conn. 1997); Nat'l Semiconductor Corp. v. Allendale Mut. Ins. Co., 549 F. Supp. 1195, 1200 (D. Conn. 1982).